UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
ISAAC GINDI,

                    Petitioner,            **MEMORANDUM AND ORDER**
                                           14-CV-755, 11-CR-294
         -against-                         (KAM)


UNITED STATES OF AMERICA,


                    Respondent.
----------------------------------X


**MATSUMOTO, United States District Judge:**

         Petitioner Isaac Gindi has filed a motion pursuant to

28 U.S.C. § 2255 to vacate his judgment of conviction and to be

resentenced, and to adjourn or stay his surrender to a Federal

Bureau of Prisons ("BOP") facility until this motion is

resolved.[1]  Mr. Gindi, is now represented by new counsel, Richard

Greenberg, and Mr. Greenberg's firm Newman & Greenberg.  For the

reasons provided below, the court denies Mr. Gindi's motion in

its entirety and further directs compliance with the court's

order dated January 6, 2014, in Mr. Gindi's criminal case No.

11-cr-294 that Mr. Gindi surrender to the BOP facility to which

---

[1] This motion was initially filed under Mr. Gindi's criminal case, No. 11-cr-
294, but was reopened as a new related civil case, No. 14-cv-755.

he has been designated on or before 2:00 p.m. on February 6, 2014.[2]

## I.  **Background**

Mr. Gindi argues there was an actual conflict of interest in this case because his former counsel, Jonathan Kaye, Esq., simultaneously represented Isaac Gindi and his younger brother Mayer Gindi in separate criminal cases.[3]  Mayer Gindi was arrested on February 23, 2011, and pleaded guilty on May 27, 2011, to an information that charged him one count of conspiracy to commit wire fraud in connection with a mortgage fraud scheme, in violation of 18 U.S.C. § 1349, and one count of bankruptcy fraud, in violation of 18 U.S.C. § 152(3), in an unrelated case before Judge Sandra L. Townes of this court.  *United States v. Mayer Gindi*, No. 11-cr-347 (SLT).  According to the information, Mayer Gindi's conspiracy to commit wire fraud took place between April 1, 2006, and July 1, 2006, and his bankruptcy fraud took place around March 19, 2009.

Mayer Gindi's mortgage fraud scheme involved the recruitment of straw buyers who applied for mortgages to purchase properties that he owned even though these straw buyers

---

[2] Mr. Gindi was sentenced on November 19, 2013, to 27 months imprisonment, three years of supervised release, and also ordered to pay a $6,000 fine and a $100 special assessment.  (ECF No. 73, No. 11-cr-294, Judgment, 11/21/13.)

[3] The court will refer to Isaac Gindi as either "Isaac Gindi" or "Mr. Gindi" and to as Mayer Gindi as "Mayer Gindi" for the sake of clarity.

had no intention of living in the properties or making mortgage payments. (ECF No. 29, No. 11-cr-347, Sentencing Memorandum, 12/4/13, at 1-2.) After closing, Mayer Gindi paid the straw buyer a portion of the proceeds he received from the sale of the property. (*Id.*) Among the potential straw buyers recommended to Mayer Gindi was an undercover agent named "Angel Mejia." (*Id.* at 2.) Mayer Gindi did not use Mejia in his mortgage fraud scheme, but he referred Mejia to his older brother Isaac Gindi.[4] In a September 2, 2009 recorded conversation, Mayer Gindi told Mejia, "I've got a brother that I do business with. I've been backing him for a couple of years and right now . . . he could get himself a business loan because his company is old enough . . . but he needs [a good credit] score with it, so he wants to meet you and figure out something." (Isaac Gindi Presentence Investigation Report ("PSR") ¶ 9.) Isaac Gindi then used Mejia's identity to engage in his own fraudulent schemes, which are the subject of his criminal case before this court. (PSR ¶¶ 5-24.)

In his criminal case, Isaac Gindi pleaded guilty to Count One of an indictment that did not name Mayer Gindi. Count One charged conspiracy to commit bank fraud, in violation of 18

---

[4] Mejia was introduced to Mayer Gindi on August 19, 2009. (Isaac Gindi Presentence Investigation Report ("PSR") ¶ 8.) Mejia presented himself to Mayer Gindi as a person with good credit who was about to return to his home country of Colombia and was willing to participate as a straw buyer in exchange for payment. (*Id.*)

U.S.C. § 1349, for fraudulent schemes that took place between September 1, 2009, and June 30, 2010, and also incorporated an allegation related to a fraudulent scheme that took place on June 30, 2008. (ECF No. 1, Indictment, No. 11-cr-294, 4/15/11.) Mayer Gindi is not a co-defendant in Isaac Gindi's criminal case, and Isaac Gindi is not a co-defendant in Mayer Gindi's criminal case. There is no evidence in the record that Mayer Gindi participated in any material way in the fraudulent schemes that Isaac Gindi and his co-defendant Daniel Baddouch pleaded guilty to perpetrating in the case before this court. Nor is there evidence in the record that Isaac Gindi was involved in Mayer Gindi's mortgage fraud scheme.[5]

Specifically, Isaac Gindi and his codefendant Mr. Baddouch used the undercover agent's identity to submit fraudulent applications for a business loan for a business registered by Isaac Gindi, a lease for a Toyota Highlander SUV for Isaac Gindi's family,[6] and numerous credit card applications.

---

[5] Although the PSR lists Mayer Gindi and several other individuals as "other defendants" on page 3, Isaac and Mayer Gindi's cases were assigned to different judges because they were unrelated and involved different fraudulent schemes.

[6] After Isaac Gindi became aware of the government's investigation, he returned the Toyota SUV to the dealership on June 24, 2010. Six days later, on June 30, 2010, Isaac Gindi's wife, Julie Gindi, signed a lease agreement for a Toyota Highlander SUV, falsely stating that she worked for a company called XTA TIC, LLC, and earned $90,000 per year. (PSR ¶ 22.) Upon subsequent questioning by case agents and a warning that making false statements was a crime, she stated that the information on her application was correct. (*Id*. ¶ 23.) Julie Gindi pleaded guilty to making false statements and was sentenced on July 13, 2012, to two years of probation by Judge Edward R. Korman of this court. (ECF No. 28, No. 11-cr-605, Judgment.)

(PSR ¶¶ 5-24.)  Isaac Gindi also submitted false income information on a fraudulent mortgage loan application for his home but did not use the undercover agent's identity to do so. (*Id.* ¶ 25.)

At a hearing on the instant § 2255 motion, held on February 3-4, 2014, Isaac Gindi and Mayer Gindi testified that Mayer Gindi did not participate in any of the fraudulent schemes charged in the indictment against Isaac Gindi and Daniel Baddouch.  Mayer Gindi testified that he "had nothing to do with" Isaac Gindi's bank fraud conspiracy.  (2/3/14 Tr. at 35.) When Isaac Gindi was asked if his brother, Mayer, was involved with "anything else with regard" to the charges in this case beyond the initial referral of an undercover agent, Isaac Gindi replied "[n]o, he did not assist me."  (*Id.* at 51-52.)

Still, there are tangential connections between Isaac Gindi's case and Mayer Gindi.  First, as agreed by Isaac Gindi, Mayer Gindi, and the government, Mayer Gindi referred the undercover government agent Mejia to his older brother, Isaac Gindi.  (PSR ¶¶ 8-10.)  Second, Isaac Gindi's PSR states that he and Mayer Gindi would have ultimately used the credit cards that Isaac Gindi, Daniel Baddouch, and another defendant, Yitzchok Kaplan, attempted to obtain through fraudulent means.  (*Id.* ¶ 18.)  This assertion appears to be based on an unsworn statement of co-defendant Daniel Baddouch to an undercover agent, in which

Mr. Baddouch says "the main ones using the money will be Isaac and Mayer and they're the ones making payments."  (ECF No. 30, No. 11-cr-294, Pre-Sentence Response of Daniel Baddouch, 10/20/11, at 3 (emphasis altered).)

At the hearing, Isaac Gindi testified that he owed his brother Mayer Gindi several hundred thousand dollars and would have paid him some of the money obtained from the fraud he carried out with Mr. Baddouch.  Neither Mr. Gindi nor his brother Mayer proffered any specific information, documents, or other records that would substantiate Mr. Gindi's testimony concerning this debt purportedly owed by Mr. Gindi to Mayer Gindi.  Instead, at the conclusion of the hearing on February 4, Mr. Gindi's counsel relied on the quoted portion of Mayer Gindi's recorded statements to Mejia in paragraph 9 of the PSR, in which Mayer Gindi told the undercover agent that he had been "backing" his brother Isaac Gindi "for a couple of years," and that Isaac Gindi wanted to meet with the undercover agent because he needed a good credit score.  (PSR ¶ 9.)

Although the court conducted a *Fatico* hearing for Mr. Gindi's co-defendant, Mr. Baddouch, and found that Mr. Baddouch was involved in other uncharged and unrelated criminal schemes with Mayer Gindi, there is no evidence that Isaac Gindi participated in these other schemes and they were thus not relevant to Isaac Gindi's sentencing.  At Mr. Baddouch's

sentencing, Mr. Baddouch's counsel argued that his client's other schemes with Mayer Gindi were masterminded by Mayer Gindi. James Moriarty, who represented Mr. Baddouch at his sentencing, recently began representing Mayer Gindi, who waived any potential conflict as to Mr. Moriarty's dual representation after a *Curcio* hearing before Judge Townes.

Significantly, however, there is no evidence in the record that Mayer Gindi played any role in Isaac Gindi's charged fraudulent schemes beyond the initial referral of the undercover agent and Mr. Baddouch's statement that Mayer Gindi and Isaac Gindi may have ultimately obtained some of the money had the credit card scheme succeeded. There is also no evidence that Isaac Gindi was involved in any of Mayer Gindi's fraudulent schemes. Mayer Gindi's fraudulent schemes took place at different times and were completely distinct from Isaac Gindi's fraudulent schemes. Isaac Gindi is not named in the information Mayer Gindi pleaded guilty to, and Mayer Gindi is not named in the indictment, including Count One, to which Isaac Gindi pleaded guilty.

Finally, Mr. Gindi's new counsel claims that there is an actual conflict in Mr. Kaye's dual representation because the government advised Judge Townes that a *Curcio* hearing may be necessary with respect to Mayer Gindi. As the government stated before this court, however, the government advised Judge Townes

out of an abundance of caution to ensure that Mayer Gindi would not also file a motion seeking to vacate his judgment and be resentenced.

## II.  Statements and Testimony

The parties submitted briefing, and Isaac Gindi, Mayer Gindi, and Jonathan Kaye all submitted additional statements in connection with Mr. Gindi's § 2255 motion.  Mr. Gindi also submitted a letter dated January 7, 2014, from his cousin, Dr. David Khaski, a clinical cardiologist at NYU Langone Medical Center, stating that Mr. Gindi's mother has been under his care for five years, and that she had a "medical history significant for congestive heart failure, chronic atrial fibrillation, severe pulmonary hypertension, gout, and chronic anemia (requiring multiple transfusions), that she "only speaks Arabic and is unable to communicate much unless her son is available," and that Mr. Gindi, who lives several blocks away from his mother, has been her "only caretaker over the past several years."  (ECF No. 1-7, Letter of Dr. David Khaski, 1/7/14.)

Isaac Gindi, Mayer Gindi, Mr. Kaye, and Mr. Gindi's wife Julie Gindi all testified at an evidentiary hearing on February 3 and February 4, 2014.  The court has considered the statements and testimony of the witnesses.

### a. Isaac Gindi

Mr. Gindi submitted a declaration under penalty of perjury in which he claimed that Mr. Kaye never asked for his permission to represent both Isaac and Mayer Gindi, and that Mr. Kaye told Mr. Gindi that the government was "OK with" his representation of both brothers. (ECF No. 1-3, Declaration of Isaac Gindi, 1/17/14, at 2.) Mr. Gindi declared that Mr. Kaye never discussed the possibility of blaming Mayer Gindi "for getting me into trouble in this case" and that he never told Mr. Kaye that he did not want to blame his brother. (*Id.*)

Mr. Gindi also declared that Mr. Kaye discouraged him from bringing up the role and statements of Mr. Gindi's co-defendant Daniel Baddouch because he did not want it to appear that Isaac Gindi was disputing his guilt or not accepting responsibility. (*Id.*) Mr. Gindi declared that after he was sentenced, he met with Mr. Kaye, who told him that he could ask the court to reconsider the sentence on the grounds that his aged and infirmed mother needed him to take care of her, and that he could retain new counsel to bring a habeas corpus petition and "throw him [Mr. Kaye] under the bus." (*Id.*)

Mr. Gindi testified that his brother Mayer Gindi had no role in the conspiracy, and that he owed his brother "[a] few hundred thousand dollars" but did not provide details about this purported debt. (Tr. at 51-52.) Mr. Gindi testified that Mr.

Kaye "discouraged" him from cooperating against anyone, including his brother Mayer Gindi, and claimed he could not recall that his wife dismissed the idea of cooperating with the government during a meeting with Mr. Kaye. (*Id.* at 79-80.) Mr. Gindi also testified that he did not have any information to provide the government concerning his brother Mayer Gindi besides the fact that Mayer Gindi had introduced him to the undercover agent. (*Id.* at 80-81.)

Mr. Gindi also testified that Mr. Kaye never asked him or suggested to him that he obtain a letter from a doctor supporting his mother's alleged medical condition. (*Id.* at 50-51.) In his reply memorandum, filed three days before the hearing, however, Mr. Gindi conceded that that Dr. Khaski was never asked to write a letter regarding the mother's health before Mr. Gindi's sentencing "in part because Dr. Khaski is very busy and in part because Isaac was too embarrassed to ask his cousin the medical doctor." (ECF No. 10, Reply, 1/31/14, at 5.)

### b. Mayer Gindi

Mayer Gindi also stated in a declaration under penalty of perjury that Mr. Kaye told him he would represent both Mayer and Isaac Gindi if the prosecutors would accept his dual representation but did not ask if he had a "problem" with dual representation or discuss "various problems that could arise"

from the representation of Isaac Gindi. (ECF No. 1-4, Declaration of Mayer Gindi, 1/17/14, at 2.) Mayer Gindi further declared that Mr. Kaye told him "that he would reserve the best available arguments for my sentencing, and not use them for Isaac because Isaac did not need as much help as I did" as Judge Townes was perceived to be a harsher sentence than this court. (*Id.* at 3.) Mayer Gindi also asserted that Mr. Kaye told him he would reserve the argument about the health of the Gindis' elderly mother for Mayer Gindi's sentencing. (*Id.*)

Mayer Gindi testified that his mother speaks French, Arabic, and "broken" English, and worked in this country as a receptionist at Republic National Bank and as a real estate agent. (Tr. at 8-9.) Mayer Gindi further testified that Mr. Kaye was aware that both Mayer Gindi and his brother Isaac Gindi had a drinking problem, but that he told Mayer Gindi that he would save that argument for him because it would not be plausible if both brothers claimed to have alcohol abuse issues. (*Id.* at 14.) Mayer Gindi acknowledged, however, that he now knew that the judges would "not look at each other's cases." (*Id.* at 16.) Finally, Mayer Gindi testified that he had discussed his mother's medical condition with Mr. Kaye, and that Mr. Kaye had told him his mother's condition should only be raised in Mayer Gindi's case because "he felt that I needed the . . . arguments" more than Isaac Gindi. (*Id.*)

### c. Jonathan Kaye

Mr. Kaye submitted two letters in connection with this
resentencing motion.[7]  In his first letter, dated January 1,
2014, Mr. Kaye stated that he sought and obtained consent from
both Isaac Gindi and Mayer Gindi to his representation of both
of them, that Isaac Gindi did not want to blame his brother or
anyone else for his actions, and that Mr. Kaye and Isaac Gindi
discussed and decided not try to blame Mayer Gindi or anyone
else to avoid the risk that the court might find Isaac Gindi had
not demonstrated acceptance of responsibility.  (ECF No. 87, No.
11-cr-294, Letter of Jonathan Kaye, 1/1/14, at 1-2.)  Mr. Kaye
also stated that he made the same arguments concerning Mr.
Gindi's ailing mother in submissions on behalf of both brothers,
and noted that his submission on behalf of Mayer Gindi was
different only in that it pointed out that Isaac Gindi had
already been sentenced.  (*Id.* at 2.)  Mr. Kaye stated that Judge
Townes, due to a conflict in her calendar, had adjourned Mayer
Gindi's sentencing to a later date than Isaac Gindi's
sentencing, even though Mayer Gindi had pleaded guilty six
months before Isaac Gindi, which this court has confirmed is
accurate based on a review of the docket of Mayer Gindi's case.

---

[7] Under Rule 1.6(b)(5)(i) of the New York Rules of Professional Conduct, a
lawyer "may reveal or use confidential information to the extent that the
lawyer reasonably believes necessary . . . to defend the lawyer or the
lawyer's employees and associates against an accusation of wrongful conduct."
22 NYCRR § 1200.

(*Id.*) Finally, Mr. Kaye asserted that he could "state to this Court unequivocally that I would not have done anything different in my representation of Isaac Gindi, even if I had not been representing his brother Mayer." (*Id.*)

In a January 22, 2014 letter, Mr. Kaye stated that both Mayer and Isaac Gindi's assertions that he failed to seek their individual consent to the dual representation and instead told them the government had consented to his dual representation of both of them were incorrect. Mr. Kaye further stated that he did not seek the government's permission before representing either of the Gindis. Mr. Kaye also said he repeatedly asked Isaac Gindi for medical corroboration about his mother's poor health, but did not receive any such corroboration. (ECF No. 4, Letter from Jonathan Kaye, 1/22/14, at 1-2.)

Mr. Kaye questioned the January 7, 2014 letter from Dr. David Khaski regarding the health of the Gindis' mother in connection with this motion and noted that he could have made a more forceful argument concerning their mother had he been provided with such medical documentation before Mr. Gindi's sentencing. (*Id.* at 2.) Mr. Kaye also stated that Mr. Gindi had told him that he did not want to blame his brother Mayer Gindi for his actions, that Mr. Gindi did not want to cooperate with the government, and that Mr. Gindi had decided to plead

guilty after reviewing the discovery provided by the government. (*Id.*)  Finally, Mr. Kaye stated that he understood Mr. Gindi was upset by the sentence and that he advised him that he could file a motion for reconsideration based on any medical documentation related to his mother and could proceed with new counsel.  (*Id.* at 2-3.)

Mr. Kaye testified that he did not perceive any conflict concerning Isaac Gindi or Mayer Gindi, that he never sought the government's permission to represent Isaac or Mayer Gindi, and that he did not tell Mayer Gindi that he was saving the best arguments for his sentencing even though doing so may hurt Isaac Gindi.  (2/4/14 Afternoon Tr. at 15-17, 30.)  Mr. Kaye also testified that Isaac Gindi had consistently stated that he would not cooperate with the government against anyone. (*Id.*)  Mr. Kaye testified that, when he met with Isaac and Julie Gindi shortly after the November 19, 2013 sentencing to discuss options, Mr. Gindi's wife declared that she was opposed to her husband cooperating against anyone, stating "[w]e're not doing that."  (*Id.* at 18.)  Mr. Kaye explained that Isaac and Julie Gindi did not explain their reasons for refusing to cooperate, but that he understood their reluctance to cooperate because Mr. Kaye, like the Gindis, was a member of the Orthodox Jewish community, and knew that cooperation with the government was not viewed favorably by members of that community.  (*Id.* at 18-19.)

Mr. Kaye further testified that he had repeatedly asked Mr.
Gindi numerous times for a year and a half before the sentencing
for some type of medical documentation relating to his mother's
health problems but that Mr. Gindi had not provided him with any
such documentation.  (*Id.* at 46.)  Mr. Kaye explained that he
had asked Mr. Gindi to obtain medical documentation from his
mother's physician rather than doing so himself because he
believed that Mr. Gindi, as his mother's son, would be better
positioned to obtain a letter from a doctor and other medical
documentation relating to his mother due to privacy protections
for patients in the Health Insurance Portability and
Accountability Act.  (*Id.* at 49-50.)

Mr. Kaye also testified that he told Isaac Gindi that
he would not discuss the details of Mayer Gindi's case with him,
and that he told Mayer Gindi that he would not discuss the
details of Isaac Gindi's case with him.  (*Id.* at 10-11.)  Mr.
Kaye also testified that both Isaac Gindi and Julie Gindi were
upset by the sentence when he met with them and he advised them
that they were free to retain new counsel and "throw [him] under
the bus."  (*Id.* at 21.)

### d. Julie Gindi

Julie Gindi testified about her meeting with Mr. Kaye
and Isaac Gindi, which took place shortly after Mr. Gindi's
sentencing on November 19, 2013, but claimed she could not

recall any details about what she may have said concerning cooperation during that meeting.  Mrs. Gindi claimed she was very upset and emotional during that meeting.  (*Id.* at 90-94.)

### III.   **Factual Findings**

The court does not find the testimony of Isaac Gindi, Mayer Gindi, or Julie Gindi credible to the extent it is at odds with Mr. Kaye's account of his discussions with Mr. Gindi, Mayer Gindi, and Julie Gindi.  Additionally, the court finds that Mayer Gindi knowingly made materially false statements to this court under penalty of perjury in connection with this proceeding.

Mayer Gindi made statements while testifying that contradicted previous statements he submitted to this court under penalty of perjury.  Mayer Gindi stated in his declaration under penalty of perjury that his mother "is only fluent in Arabic," (ECF No. 1-4, Declaration of Mayer Gindi, 1/16/14, at 3), and confirmed the representations in a letter submitted from Isaac Gindi's cousin Dr. David Khaski, including that his mother "only speaks Arabic," (*id.* (quoting ECF No. 1-7, Letter from Dr. David Khaski, 1/7/14)).  Yet Mayer Gindi testified that his mother speaks French, Arabic, and "broken" English, and worked as a receptionist at Republic National Bank and as a real estate

agent. (Tr. at 8-9.)[8] The court thus finds that Mayer Gindi

knowingly made a false statement under penalty of perjury that

his mother "is only fluent in Arabic." This statement is

material because, if it were true, it would support Isaac

Gindi's argument for a sentence below the guidelines, so he

could take care of his mother who needed him to assist her in

part due to her inability to speak English. Even so, the court

considered Mr. Gindi's sympathetic family circumstances

including the health of Mr. Gindi's mother at sentencing and

noted that his wife is in good health and does not work and that

three of his five children are adults. (Transcript of

Sentencing of Isaac Gindi at 25, 28.)

The court also does not find credible many of the

statements made by Isaac Gindi and Mayer Gindi concerning their

interactions and discussions with Mr. Kaye regarding his dual

representation. Mr. Kaye credibly testified that he did not

seek permission from prosecutors to represent the Gindi

brothers. The court credits Mr. Kaye's testimony that Isaac

Gindi never told him he had any problems with alcohol, that he

had no knowledge of any such problem with Isaac Gindi, and that

when he attended the presentence interview with the Probation

---

[8] When asked if his mother spoke multiple languages, Mayer Gindi testified
that "[s]he spoke French also," and when asked if his mother had "ever spoken
English on her job," Mayer Gindi testified that "[s]he speaks broken English,
yes." (Tr. at 8.)

Department, Isaac Gindi denied alcohol abuse. (*See* PSR ¶ 54

("The defendant has no history of alcohol abuse or drug use.").)

As a practical matter, it does not make sense and the court does

not credit Mayer Gindi's claim that Mr. Kaye would tell Mayer

Gindi that he did not want to bring up Isaac Gindi's issues with

alcohol in an unrelated sentence before a different judge who

would not be familiar with Mayer Gindi's alcohol use issues.

Moreover, the arguments made and case law cited by Mr.

Kaye concerning the Gindis' mother are virtually identical, as

confirmed by the court's review of the sentencing memorandums

submitted by Mr. Kaye on behalf of Isaac Gindi and Mayer Gindi.

Thus, it is not plausible that Mr. Kaye would tell Mayer Gindi

that he was reserving the best arguments for him but then make

virtually identical submissions concerning the Gindis' mother in

his submissions on behalf of both brothers.

The court also credits Mr. Kaye's testimony that he

repeatedly asked Isaac Gindi for medical documentation of his

mother's health condition. Indeed, Isaac Gindi concedes in his

Reply that he was too embarrassed to ask his cousin, Dr. David

Khaski, for a medical letter and was concerned that Dr. Khaski

was too busy to do so. Further, the PSR indicates that Isaac

Gindi did not tell his mother about his conviction and requested

that the Probation Department not interview her, thus

corroborating Mr. Kaye's testimony and offering a possible

explanation for Mr. Gindi's failure to provide a medical letter regarding his mother prior to sentencing.  (PSR ¶ 44.)

The court also does not find credible the testimony by Isaac Gindi that he owed Mayer Gindi "[a] few hundred thousand dollars."  (Tr. at 51.)  The only evidence offered by Isaac Gindi to show that this purported debt to Mayer Gindi exists is Mayer Gindi's statement to an undercover agent that he had "been backing" his brother "for a couple of years."  (PSR ¶ 9.)  Yet even if this statement refers to a loan, it provides no details on the amount of any such purported loan by Mayer Gindi to Isaac Gindi, let alone a loan or loans that exceeded the several hundred thousand dollars that Isaac Gindi attempted to obtain through his fraud schemes.  Nor does this statement indicate that Mayer Gindi knew about or participated in Isaac Gindi's fraud, which both Gindis deny.  Moreover, neither Isaac nor Mayer Gindi has explained any details about any loans or provided any documentation for such loans.  The court accordingly does not find it plausible that such a large debt exists given that the parties have no records to substantiate the testimony about this purported debt.

The court further notes that Isaac Gindi's recent testimony blaming his brother for the initial referral is inconsistent with his August 29, 2013 letter to this court, in which he clearly stated that "I can only blame myself for these

events and the poor choices I made . . . . *It is I, and I alone*, who is truly to blame for where I find myself today." Additionally, at his sentencing, Mr. Gindi, who was under oath at the time, stated "I definitely did the wrong thing, and *I only have myself to blame*." (Sentencing Tr. at 5 (emphasis added).)

Furthermore, the court does not find credible the testimony of Julie Gindi that she did not remember telling Mr. Kaye that she was opposed to her husband cooperating against anyone at a meeting with Mr. Kaye shortly after her husband's sentencing. Mrs. Gindi was evasive during her testimony and alternated between saying that she did not remember the meeting and that she was not comfortable testifying about the meeting. Given that this meeting took place relatively recently – shortly after her husband's sentencing on November 19, 2013 – it is not plausible that she does not remember details of the meeting, including what she said about the possibility of her husband's cooperation, because she was purportedly too emotional.

The court bases its credibility determinations on the demeanors of Isaac Gindi, Mayer Gindi, and Julie Gindi while testifying, in addition to the fact that they gave implausible testimony and testimony contradicted by other evidence. Isaac Gindi, Julie Gindi, and Mayer Gindi repeatedly offered vague and evasive answers to questions while testifying and were not

forthright with answers.  The court has also considered the fact that Isaac Gindi, Mayer Gindi, and Julie Gindi are all convicted felons who pleaded guilty to crimes involving fraud and false statements.

Finally, the court finds the testimony of Mr. Kaye credible in its entirety based on both Mr. Kaye's demeanor and the fact that he provided testimony consistent with his previous statements and with other evidence in the record.  Mr. Kaye also provided direct and detailed answers to questions while testifying.  To that end, the court finds that Mr. Kaye obtained permission from both Mayer and Isaac Gindi before representing Isaac Gindi, that Mr. Kaye never told Mayer Gindi he was reserving the best arguments for Mayer Gindi's sentencing, that Mr. Kaye was never informed of any alcohol problem involving Isaac Gindi and thus did not tell Mayer Gindi that he could not raise alcohol abuse in both brothers' submissions, and that Mr. Kaye repeatedly urged Isaac Gindi to obtain medical documentation about the Gindis' mother.

The court also finds credible that Mr. Kaye advised Isaac Gindi about the possibility of cooperation, and that both Isaac and Julie Gindi were firmly opposed to the possibility of Isaac Gindi cooperating against anyone.  Indeed, Isaac Gindi testified at the hearing that he had no information regarding his brother Mayer Gindi other than the referral of the

undercover agent, a fact known to the government.  The court

also finds credible Mr. Kaye's testimony that he made decisions

about which arguments to make on behalf of Mr. Gindi due to

strategic considerations and not as a result of any purported

conflict.

IV.  **Legal Standards**

Mr. Gindi argues that Mr. Kaye's dual representation

presents an actual conflict of interest, thus obviating the need

to show prejudice.  To establish an actual conflict of interest,

a defendant must meet two requirements: First, he must establish

that counsel "actively represented conflicting interests," such

that the interests of the defendant and his attorney "diverge

with respect to a material fact or legal issue or to a course of

action." *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir.

2002).  Second, the defendant must show that the "actual

conflict of interest adversely affected his lawyer's

performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350

(1980).  To demonstrate such an adverse effect on counsel's

performance, a defendant must establish that the actual conflict

resulted in a "lapse of representation." *United States v.

Stantini*, 85 F.3d 9, 16 (2d Cir. 1996) (citation omitted); *see

also United States v. Gambina*, 51 F. App'x 40, 43 (2d Cir. Nov.

19, 2002) (summary order) (finding defendant must demonstrate

causal connection between actual conflict and lapses in

representation by proving lapses "*resulted* from" or were "*due to*" the conflict of interest itself)(quotation and citation omitted)(emphasis in original).

"To prove a lapse of representation, a defendant must 'demonstrate that some plausible alternative defense strategy or tactic might have been pursued' but was not pursued because 'the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *United States v. Felzenberg*, Nos. 97 Civ. 2800 & 93 CR 460, 1998 WL 152569, at *15 (S.D.N.Y. Apr. 2, 1998) (quoting *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993). "The term 'plausible alternative defense strategy' does not embrace all possible courses of action open to a defense attorney; it refers to those which a zealous advocate would reasonably pursue under the circumstances." *Lopez v. Scully*, 58 F.3d 38, 42 (2d Cir. 1995).

Additionally, this court has an obligation to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994). "In fulfilling this initial obligation to inquire into the existence of a conflict of interest, the trial court may rely on counsel's representations." *United States v. Kliti*, 156 F.3d 150, 153 (2d Cir. 1998). "Whenever the court's inquiry reveals that a

criminal defendant's attorney in fact suffers from an actual or potential conflict, the court has a subsequent 'disqualification/waiver' obligation." *Levy*, 25 F.3d at 153.

## V. <u>Application to Current Case</u>

In his § 2255 motion, Mr. Gindi has identified four alleged lapses in representation that he claims resulted from Mr. Kaye's dual representation of him and his brother Mayer Gindi. First, Mr. Gindi claims that Mr. Kaye failed to argue that Mayer Gindi was more culpable than Mr. Gindi for the bank fraud scheme at issue in this case. Second, Mr. Gindi argues that Mr. Kaye failed to challenge his loss calculations because doing so would have "risked bringing out and emphasizing Mayer's involvement in the transaction." (ECF No. 1, Motion to Vacate ("Def. Mot."), 2/4/14, at 10.) Third, Mr. Gindi argues that Mr. Kaye failed vigorously to argue that Mr. Gindi deserved a downward departure because his presence was needed by his elderly and ailing mother. Fourth, Mr. Gindi argues that Mr. Kaye advised him to plead guilty and failed to advise him that he could gain additional leniency by cooperating with the government against his brother Mayer Gindi. (*Id.* at 8-13.)

### a. Mayer Gindi's Culpability

It would not be plausible for Mr. Gindi's counsel to argue that Mayer Gindi was somehow more responsible for the bank fraud conspiracy that Mr. Gindi pleaded guilty to than Mr. Gindi

because Mayer Gindi's minimal connection is limited to the referral of the undercover agent to Isaac Gindi and the possible receipt of some money, and there is no evidence that Mayer Gindi participated with Isaac Gindi in the bank fraud conspiracy to which Isaac Gindi pleaded guilty.  Mayer Gindi referred an undercover agent to Isaac Gindi, and, according to a statement by Mr. Baddouch to a government agent, Mayer Gindi would have received some proceeds of the credit card scheme had the scheme succeeded.  There is no evidence in the record, however, to suggest that Mayer Gindi knew of, planned, supervised, or participated in any way in the fraudulent schemes that Isaac Gindi and Daniel Baddouch engaged in.  Because there are *no* facts to suggest that Mayer Gindi was involved in Isaac Gindi's bank fraud conspiracy scheme beyond the initial referral and possibly receiving some of the money derived from the credit card scheme had it succeeded, it would not have been plausible for Mr. Kaye to argue that Mayer Gindi was more culpable than Isaac Gindi for the schemes in Count One of the indictment to which Isaac Gindi pleaded guilty.

Moreover, Mayer Gindi testified that he "had nothing to do with" Isaac Gindi's bank fraud conspiracy, (Tr. at 35), and Isaac Gindi testified that Mayer Gindi "did not assist" him in any respect concerning the bank fraud scheme to which he pleaded guilty beyond the initial referral.  (*Id.* at 51-52.)  It

would not be plausible for Isaac Gindi's counsel to argue that Mayer Gindi did in fact have such a role because both Isaac Gindi and Mayer Gindi have testified under penalty of perjury that Mayer Gindi had no role in Isaac Gindi's bank fraud conspiracy beyond an initial referral.

The court also finds credible Mr. Kaye's statements and testimony that he did not pursue a defense strategy of blaming Mayer Gindi because he did not want it to be seen as if Isaac Gindi was deflecting blame and risk losing credit for acceptance of responsibility. Thus, even if blaming Mayer Gindi as more culpable were a plausible defense strategy – which it was not – there is no indication that Mr. Kaye failed to pursue it due to his dual representation of Mr. Gindi and Mayer Gindi. Indeed, had Mr. Kaye made such an implausible argument, the court would have been hard pressed to find, as it did, that Isaac Gindi had demonstrated acceptance of responsibility.

Finally, as previously stated, the court does not find credible that Isaac Gindi owed his brother "[a] few hundred thousand dollars," as he testified. (Tr. at 51.) Mr. Gindi has provided no documentation for such a purported debt, and Mayer Gindi did not mention such a large debt owed by his brother during his testimony. Indeed, the only evidence in the record upon which Mr. Gindi relies is the previously discussed recording in which Mayer Gindi told an undercover agent that he

had been "backing" his brother for "a couple of years," and this would not provide a plausible basis for Isaac Gindi to attempt to shift blame to his brother for his criminal conduct.[9]

### b. Loss Calculations

Also without merit is Mr. Gindi's argument that Mr. Kaye failed to challenge his loss calculations because doing so purportedly would have emphasized Mayer's involvement in the scheme. Mr. Kaye's August 29, 2013 sentencing submission on behalf of Isaac Gindi did in fact challenge the loss calculations, asserting, *inter alia*, that an undercover agent was told that the loans would be repaid and that no actual loss occurred, and Mr. Kaye made a similar argument at the sentencing. This court rejected that challenge to the loss amount based on a purported intention to repay due to the financial and income information for Mr. Gindi provided in the PSR. The court found that it was not plausible that Mr. Gindi intended to repay the money he tried to obtain through fraud because he sought to borrow hundreds of thousands of dollars through fraudulent means yet lacked the income or assets to repay such large amounts of money.

Although Mr. Kaye argued that Mr. Gindi told the undercover agent in certain recordings that he intended to pay

---

[9] Even if Isaac Gindi did owe such money to his brother, it would not be reasonable for a lawyer to argue that Mayer Gindi was more culpable because both Isaac and Mayer Gindi have testified that Mayer Gindi had no role in Isaac Gindi's fraudulent scheme beyond the initial referral.

back the loans obtained through fraud, Mr. Gindi now claims that
Mr. Kaye did not specifically cite an isolated unsworn statement
by Mr. Baddouch that Isaac and Mayer Gindi would be "making
payments" due to his representation of Mayer Gindi.  But the
government has stated that Mr. Kaye was not provided with Mr.
Baddouch's statement to the undercover agent before Mr. Gindi's
sentencing and thus would not have been aware of it.  When asked
about the fact that this statement by Mr. Baddouch was included
in a sentencing submission by Mr. Baddouch's lawyer, Mr. Kaye
testified that, although it was his practice to read sentencing
submissions by Mr. Baddouch's counsel, he was not aware of this
statement before Mr. Gindi's sentencing and that he did not
discuss Mr. Baddouch's statement with Mayer Gindi, counsel for
Mr. Baddouch, or with the government, and did not remember
discussing this statement with Isaac Gindi.  (2/4/14 Tr. at 82-
83, 86-87.)  Mr. Kaye also testified that he recalled reading
Mr. Baddouch's statement only in the submissions made by Mr.
Gindi's counsel in connection with this § 2255 proceeding.  (*Id.*
at 34-35.)  The court finds Mr. Kaye's testimony that he was not
aware of Mr. Baddouch's statement until after Mr. Gindi was
sentenced to be credible and thus also finds that he could not
have made any argument based upon the statement before or during
Mr. Gindi's sentencing because he did not know about it at the
time.  (*Id.* at 22-23.)

Even if Mr. Kaye had been aware of this statement, because Mr. Baddouch's statement attributed the same purported actions and intentions – use of the credit cards and repayment – to *both* Isaac *and* Mayer Gindi, there is nothing about Mr. Baddouch's statement that would tend to inculpate or exculpate one brother more than the other.[10]  Accordingly, use or failure to use the statement is not an "'alternative defense [that] was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests'" as it does not help or hurt one Gindi brother more than the other or at the expense of the other.  *Felzenberg*, 1998 WL 152569 at * 15 (S.D.N.Y. Apr. 2, 1998) (quoting *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993)).

Finally, the court finds credible and plausible Mr. Kaye's explanation that he did not focus his defense strategy on challenging the loss amount calculations because he and Mr. Gindi decided that the best strategy was for Mr. Gindi to demonstrate that he had taken responsibility for his actions. (2/4/14 Tr. at 22-23.)  Thus, the court finds without merit the claim that Mr. Kaye intentionally refrained from making an argument based on Mr. Baddouch's statement or otherwise

---

[10] As previously explained, Mr. Gindi's PSR already included the statement that Isaac and Mayer Gindi may receive some money as a result of the credit card fraud, which appears to be based on this recording, but the PSR does not mention any intention to repay.  The court notes that the government did not seek to introduce this statement against Mayer Gindi in its sentencing submission in his criminal case.

vigorously contesting the intended loss amount due to any purported conflict.

### c. Health of Mother

The court also finds Mr. Gindi's argument concerning Mr. Kaye's alleged failure to argue forcefully for a downward departure based on the health of Mr. Gindi's mother to be without merit.   Mr. Kaye pointed out, accurately, that his submissions on behalf of both Isaac and Mayer Gindi included essentially the same arguments and the same case law.   The only additional argument made by Mr. Kaye on behalf of Mayer Gindi was the fact that Isaac Gindi had already been sentenced to a term of incarceration.   The timing of Mayer Gindi's sentencing occurred because his sentencing date was previously adjourned by Judge Townes to a date after Isaac Gindi's sentencing due to a conflict in her calendar and not as a result of any purported conflict.

The additional letter from Mr. Gindi's cousin, Dr. David Khaski, a cardiologist, dated January 7, 2014 and submitted on January 17, 2014, well after Mr. Gindi's sentencing, has little bearing on whether Mr. Kaye could have made a more forceful argument on behalf of Isaac Gindi based on his mother's health.   Mr. Kaye did argue at length in Mr. Gindi's sentencing submission that the court should grant a departure to Mr. Gindi based on his family circumstances,

including his mother's health and her dependence on him. The court finds credible Mr. Kaye's statements and testimony that he actively and repeatedly sought medical documentation related to the health of Mr. Gindi's mother, and that Mr. Gindi failed to provide this information to Mr. Kaye before his sentencing.

The court does not find credible Mr. Gindi's testimony that Mr. Kaye never asked him for medical documentation concerning his mother's health. Indeed, Mr. Gindi conceded in his reply brief that he did not ask Dr. Khaski for a medical letter because Dr. Khaski was "very busy" and Mr. Gindi was "too embarrassed" to ask. (ECF No. 10, Reply, 1/31/14, at 5.) Moreover, the recent letter by Dr. Khaski was not submitted by Mr. Kaye in the nearly identical sentencing submission on behalf of Mayer Gindi. Thus, Mr. Kaye's alleged failure was not due to any conflict but rather due to Mr. Gindi's inaction.

The court also notes that, in connection with the recent hearing, Mayer Gindi knowingly made a false statement under penalty of perjury about his mother's language capabilities. Mayer Gindi stated in his declaration, under penalty of perjury, that their mother "is only fluent in Arabic," (ECF No. 1-4, Declaration of Mayer Gindi, 1/16/14, at 3), and confirmed the representations in a letter submitted from Isaac Gindi's cousin Dr. David Khaski, including that his mother "only speaks Arabic," (ECF No. 1-7, Letter from Dr. David

Khaski, 1/7/14).  Yet Mayer Gindi testified that his mother

speaks French, Arabic, and "broken" English, and worked as a

receptionist at Republic National Bank and as a real estate

agent.  (Tr. at 8-9.)  It is thus not credible that the Gindis'

mother speaks only Arabic and requires only Isaac Gindi's

assistance, based on evidence in the record that she has lived

in the United States since 1976, and that she worked as the sole

provider for her four children as a receptionist at Republic

National Bank and as a real estate agent.[11]

### d. Guilty Plea and Cooperation

Finally, the court finds meritless Mr. Gindi's

argument that Mr. Kaye failed to advise him that he could obtain

additional leniency by cooperating against his brother, Mayer.

First, Mayer Gindi had already pleaded guilty to an information

*before* Mr. Kaye began representing Isaac Gindi, and the

government has stated that it was not interested in securing Mr.

Gindi's cooperation against Mayer Gindi.  Second, Mr. Gindi has

still not stated that he has any incriminating information that

he is willing to offer against his brother or anyone else

besides the fact that his brother referred the undercover agent

to him, which the government already knows.  Third, the court

---

[11] Although the court is sympathetic to Mr. Gindi's mother and her health
concerns, it notes that Mr. Gindi's wife, who is in her early 40s, is not
incarcerated, and he has two other adult siblings, not including Mayer Gindi,
and three adult children who are available to assist his mother.

finds credible Mr. Kaye's assertion and testimony that Mr. Gindi
was not interested in helping himself by offering incriminating
information against anyone, and that his wife Julie Gindi was
also opposed to her husband cooperating against anyone.[12]

### VI.  Conclusion

For the reasons set forth above, the court finds that
Mr. Gindi has failed to establish that Mr. Kaye had an actual
conflict of interest, and that Mr. Gindi has failed to establish
that any purported conflict of interest adversely affected Mr.
Kaye's performance.  The court further finds that Mr. Kaye
conducted himself properly in representing Mr. Gindi in all
respects.

Accordingly, Mr. Gindi's motion to vacate his judgment
of conviction and to be resentenced is denied in its entirety.
The court denies a certificate of appealability pursuant to 28
U.S.C. § 2253(c)(2) because the court finds that Mr. Gindi has
failed to make a substantial showing of the denial of a
constitutional right.  The court further denies any request to
stay or adjourn Mr. Gindi's surrender date pending any appeal or
for any other reason.

As previously ordered, Mr. Gindi shall surrender on or
before 2:00 p.m. on February 6, 2014, to the facility to which

---

[12] The court notes that Mr. Gindi, at the outset of this evidentiary hearing,
confirmed yet again under oath that he did not wish to withdraw his guilty
plea.

he has been designated by the BOP.  The clerk of court is

respectfully requested to enter judgment for the government and

to close this case.


**SO ORDERED**.


Dated: February 5, 2014
       Brooklyn, New York


                                   _____  /s/_____  _____
                                   KIYO A. MATSUMOTO
                                   United States District Judge
                                   Eastern District of New York