UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
ISAAC GINDI,

                   Petitioner,       **MEMORANDUM & ORDER**
                                      14-CV-755, 11-CR-294
    -against-                       (KAM)


UNITED STATES OF AMERICA,


                   Respondent.
----------------------------------X

**MATSUMOTO, United States District Judge:**

       Petitioner Isaac Gindi has moved this court to
reconsider its February 5, 2014 decision denying his motion to
vacate his judgment of conviction and be resentenced pursuant to
28 U.S.C. § 2255. (ECF No. 18, Motion for Reconsideration
("Mot."), 3/21/14.)  For the reasons set forth below,
petitioner's motion for reconsideration is denied in its
entirety.

**Background**

       Although the parties are familiar with the extensive
background of this case, the court will discuss certain facts
relevant to petitioner's motion for reconsideration.  Petitioner
pleaded guilty on November 22, 2011 to one count of conspiracy
to commit bank fraud in violation of 18 U.S.C. § 1349, (No. 11-
cr-294, ECF No. 34, Minute Entry for Guilty Plea, 11/22/11), and
was sentenced on November 19, 2013, to 27 months imprisonment,

1

three years of supervised release, and also ordered to pay a $6,000 fine and a $100 special assessment, (No. 11-cr-294, ECF No. 73, No. 11-cr-294, Judgment, 11/21/13). On January 17, 2014, petitioner moved to vacate his judgment of conviction pursuant to 28 U.S.C. § 2255 and be resentenced.[1] Petitioner argued that he had been denied his right to effective assistance of counsel under the Sixth Amendment because his former attorney, Jonathan Kaye, Esq., had an actual conflict of interest due to his representation in a separate prosecution of petitioner's brother Mayer Gindi, and had acted to the detriment of petitioner as a result of this purported actual conflict of interest.[2] After conducting an evidentiary hearing on February 3-4, 2014, the court denied petitioner's § 2255 motion in its entirety on February 5, 2014. (ECF No. 12, Order Denying Motion to Vacate/Set Aside/Correct Sentence ("Feb. 5 Order"), 2/5/14.)

On February 21, 2014, counsel for the government disclosed that they had "recently discovered" a report containing statements made by Mayer Gindi during a proffer meeting with the government on March 30, 2011, that was "arguably relevant to the Court's decision denying the

---

[1] Petitioner initially filed his motion to be resentenced as a motion in his criminal case, No. 11-cr-294, but the motion was reopened as a new related civil case, No. 14-cv-755.

[2] The court will refer to Isaac Gindi as either "Isaac Gindi" or petitioner and to Mayer Gindi as "Mayer Gindi" for the sake of clarity.

petitioner's motion pursuant to 28 U.S.C. § 2255." (ECF No. 14, Letter re: Additional Information, 2/21/14.) The government further acknowledged that Mayer Gindi conceded during his proffer meeting that "he was aware of the petitioner's bank fraud scheme" and stated that, although Mr. Kaye and the same assistant United States attorneys who prosecuted Isaac Gindi were present at the proffer meeting with Mayer Gindi, "the Assistant United States Attorneys who were present had no recollection of the statements contained in the report." (*Id.* at 1 n.1.) In response to a court order inviting petitioner to inform the court as to how he wished to proceed in light of the new information disclosed by the government, petitioner, who is now represented by the law firm Newman & Greenberg LLP, stated that he wished to move the court "to reconsider or renew [petitioner's] §2255 motion." (ECF No. 15, Letter re: Contemplated Motion, 2/27/14.)

The government subsequently turned over additional documents to petitioner's counsel: notes of the government's June 2010 interview of petitioner's co-conspirator and co-defendant Daniel Baddouch, notes by the government's undercover agent, "Angel Mejia," concerning his conversations with Mayer Gindi, and a memorandum of the August 2010 proffer meeting between the government and Yitzchok Kaplan, who also participated in the instant bank fraud conspiracy with Baddouch

and Isaac Gindi.  (ECFs No. 16-17.)  The motion for
reconsideration was fully briefed on April 25, 2014.  The court
notes at the outset that petitioner has confirmed yet again that
he does *not* seek to withdraw his guilty plea.  (Mot. at 1, 2
n.1.)

### A. The Court's Previous Findings

After considering the affidavits, exhibits, and
testimony submitted during the February 3-4 evidentiary hearing,
the court did not find the testimony of Isaac Gindi, Mayer
Gindi, or Isaac Gindi's wife Julie Gindi credible to the extent
that such testimony was at odds with the testimony of Mr. Kaye
concerning his discussions with Isaac Gindi, Mayer Gindi, and
Julie Gindi.  (Feb. 5 Order at 16.)  But the court found that
Mayer Gindi knowingly made materially false statements to the
court under oath while testifying in the proceeding and in a
declaration submitted under penalty of perjury, and that Isaac
Gindi, Julie Gindi, and Mayer Gindi provided testimony that was
not credible concerning their interactions and discussions with
Mr. Kaye.  (*Id.* at 16-22.)  The court also found that it was not
credible that Isaac Gindi owed Mayer Gindi "[a] few hundred
thousand dollars" given the dearth of documentary evidence or
any details about such a large claim.  (*Id.* at 19.)  In
addition, the court found that both Isaac Gindi and Julie Gindi

were opposed to cooperating with the government against anyone. (*Id.* at 19-20.)

Significantly, both Mayer Gindi and Isaac Gindi testified during the evidentiary hearing that Mayer Gindi had no role in Isaac Gindi's bank fraud conspiracy beyond the initial referral of Mejia. (*Id.* at 25 (quoting Transcript ("Tr.") at 35, 51-52).)[3] Mayer Gindi testified that he "had nothing to do with" Isaac Gindi's bank fraud conspiracy, (Tr. at 35), and Isaac Gindi testified that Mayer Gindi "did not assist" him in any respect concerning the fraudulent business loan, multiple credit card applications, and Toyota lease involved in the instant bank fraud scheme. (*Id.* at 51-52.) Based on this testimony by the Gindis, the court found that "[t]here is no evidence in the record . . . to suggest that Mayer Gindi knew of, planned, supervised, or participated in any way in the fraudulent schemes that Isaac Gindi and Daniel Baddouch engaged in." (Feb. 5 Order at 25.)

Finally, the court found credible Mr. Kaye's testimony that he "made decisions about which arguments to make on behalf of petitioner due to strategic considerations and not as a result of any purported conflict." (*Id.* at 22.) The court based its findings on the testimony and affidavits provided in

---

[3] Certain transcript page numbers may be different in this Memorandum & Order than in the court's Feb. 5 Order because revised and updated transcripts have since been completed.

connection with the proceeding, whether the testimony was
consistent with other evidence, and on the court's observations
of the demeanors of the witnesses.

## B. Additional Discovery

### 1. Mayer Gindi Proffer Session

On March 30, 2011, Mayer Gindi, who was then
represented and accompanied by Mr. Kaye, met in a proffer
session with government agents and the two assistant United
States attorneys who were prosecuting him and subsequently
prosecuted Isaac Gindi. (Memorandum of Proffer Session
("Proffer Mem."), 3/31/11.) According to the government
memorandum memorializing the proffer session between Mayer Gindi
and the government, Mayer Gindi admitted introducing Mejia to
his brother Isaac Gindi and told government agents that his
brother Isaac "was constantly calling" him "to discuss how" to
use Mejia "to obtain a business loan" and how to "make it
legal." (*Id.* ¶¶ 54, 61.)[4] Mayer Gindi also proffered that,
while he was not involved in obtaining the loan for Isaac Gindi,
he "knew [Isaac Gindi] intended to use Mejia to engage in loan
fraud," form a company in Mejia's name, apply for credit under

---

[4] Mayer Gindi and Mr. Kaye signed a proffer agreement which provided that
Mayer Gindi's statements would not be admissible except for the limited
purpose of impeaching false testimony provided by Mayer Gindi. (Proffer Mem.
at p. 1.) At the February 3-4 evidentiary hearing, Mayer Gindi's new counsel
indicated he would instruct his client to invoke his Fifth Amendment right
against self-incrimination rather than answer questions by Isaac Gindi's new
counsel concerning the instant bank fraud conspiracy, and Isaac Gindi's new
counsel decided not to ask Mayer Gindi any additional questions. (Tr. at 37-
45.)

Mejia's company and not pay back the loan, and that Isaac Gindi "wanted the loan to appear legal but that it was fraud." (*Id.* ¶¶ 50-51, 55.) Mayer Gindi also stated that Mejia would be paid for the use of his name and credit and that Isaac Gindi also intended to use Mejia's name and credit to lease a Toyota Highlander through fraudulent means. (*Id.* ¶¶ 56-57.)

In addition, Mayer Gindi reported during his proffer that he, Isaac Gindi, and Baddouch met on the night of June 23, 2010, after learning that Baddouch had been contacted by and spoken to government agents. (*Id.* ¶¶ 40-42, 49.) Mayer Gindi stated that he, Baddouch, and Isaac Gindi discussed withdrawing the credit applications and documents and that he had instructed Isaac Gindi and Baddouch not to withdraw the applications. (*Id.* ¶ 59.)

Mayer Gindi also proffered that Isaac Gindi had returned the Toyota Highlander obtained through fraudulent use of Mejia's identity to the dealership as a result of his conversation with Mayer Gindi. (*Id.* ¶ 63.) Finally, Mayer Gindi stated that he "knew what [Isaac Gindi] was doing was fraud, knew it was wrong," and "did not get involved in any part of the [Isaac Gindi] application using Mejia's information." (*Id.* ¶ 61.) Following the proffer session with Mayer Gindi, the government declined to offer Mayer Gindi a cooperation agreement

because the government determined him to be untrustworthy.  (ECF
No. 20, Memorandum in Opposition, 4/9/14, at 9.)

### 2. Daniel Baddouch Interview

After he was contacted by government agents on June
23, 2010, Baddouch told the agents that Isaac Gindi and Mayer
Gindi were aware of the scheme employed by Baddouch to use
Mejia's identity to "falsify loan and credit card applications"
but that he could not remember if either Mayer or Isaac Gindi
directly submitted false loan or credit card applications using
Mejia's identity.  (Memorandum of Daniel Baddouch Interview
(Exhibit B of Petitioner's Motion for Reconsideration)
("Baddouch Mem."), 6/23/10, ¶ 3.)  Baddouch proffered that he
submitted loan applications and credit card applications using
Mejia's identity, the proceeds of which were to be used by and
for the benefit of Mayer Gindi and Isaac Gindi.  (*Id.* ¶ 2.)
Baddouch said he spoke with Isaac and Mayer Gindi "often" and
that he, Mayer Gindi, and Isaac Gindi planned to direct Mejia to
transfer money obtained through the fraudulent scheme to Isaac
Gindi.  (*Id.* ¶¶ 9, 12.)

### 3. Yitzchok Kaplan Proffer Session

Kaplan met with the government in a proffer session on
August 31, 2010.  (Yitzchok Kaplan Interview Memorandum (Exhibit
D of Petitioner's Motion for Reconsideration) ("Kaplan Mem."),
9/1/10.)  Kaplan, who participated in the instant conspiracy

with Isaac Gindi and Daniel Baddouch but pleaded guilty to a separate information, (No. 11-cr-33, ECF No. 15, 3/25/11), stated in a proffer meeting that "Isaac and Mayer Gindi were desperate for money," that "Isaac Gindi, Mayer Gindi and Baddouch" wanted to use the Mejia's identity to obtain loans, and that Isaac Gindi, Mayer Gindi, and Baddouch gave him "the run around" when he tried to speak to Mejia.  (Kaplan Mem. ¶¶ 9-13.)

### C. New Findings of Fact

As a preliminary matter, the court notes its concern that the government's late disclosures of the proffers by Mayer Gindi and Yitzchok Kaplan, the interview of Daniel Baddouch, and the agent's notes, have caused understandable criticism by counsel for petitioner.  Nevertheless, the court continues to have serious doubts about the credibility of Mayer Gindi, Isaac Gindi, and Julie Gindi, who are all convicted felons who pleaded guilty to crimes involving fraud and false statements.  (Feb. 5 Order at 21.)  The court finds, however, that certain statements made by Mayer Gindi in his proffer session are partially credible because they are statements by Mayer Gindi that are against Mayer Gindi's penal interest and are corroborated to some extent by the government memorandum memorializing statements by Daniel Baddouch and the government memorandum of Yitzchok Kaplan's proffer session.  Accordingly, based on the

newly provided evidence, the court now finds that Mayer Gindi
knew that his brother Isaac Gindi would use, and was in fact
using, Mejia's identity to engage in fraud with respect to the
business loan, the Toyota Highlander lease, and credit card
applications, that Isaac Gindi constantly called Mayer Gindi to
discuss using Mejia's identity to obtain the fraudulent business
loan, which Isaac Gindi wanted to obtain through fraudulent
means but still appear legal, and that Mayer Gindi met with
Isaac Gindi and Baddouch on June 23, 2010, after Baddouch spoke
with government agents, to discuss the ramifications of what
Baddouch disclosed to the agents.  The court also finds that
Mayer Gindi did in fact advise Isaac Gindi and Baddouch not to
withdraw the submitted Mejia applications in the course of that
discussion.

        In addition, the court finds that, based upon the
statements of Mayer Gindi, Daniel Baddouch, and Yitzchok Kaplan
regarding Mayer Gindi's knowledge of and advice about Isaac
Gindi's fraudulent schemes, both Isaac Gindi and Mayer Gindi
testified falsely about material issues during the evidentiary
hearing held by this court on February 3 and 4, 2014.  When
Mayer Gindi was asked during the evidentiary hearing on February
3 whether he had *any* involvement with the bank fraud scheme that
Isaac Gindi was charged with, Mayer Gindi responded: "No. I had
nothing to do with it."  (Tr. at 35.)  Although Mayer Gindi also

told the agents during his March 30, 2011 proffer that he was
not involved in the efforts to obtain a fraudulent business loan
for Isaac Gindi, (Proffer Mem. ¶¶ 51, 54-55, 61), it is clear
that Mayer Gindi knew of and advised Isaac Gindi about the
fraudulent credit card applications and obtaining the fraudulent
business loan. (*Id.* ¶¶ 54, 59.)

Similarly, when Isaac Gindi was questioned on February
3, 2014, by the court concerning his brother Mayer Gindi's
involvement in the bank fraud scheme, he testified that Mayer
Gindi had no involvement in the scheme besides the initial
referral of Mejia:

> THE COURT: Other than referring him [Mejia], did
> your brother, Mayer, *do anything else* with regard
> to what you were charged with in this case, was
> he involved in anything? For example, did he
> assist you in the business loan that you
> attempted to obtain in Mr. [Mejia's] name?
>
> THE WITNESS: No, he did not assist me.
>
> THE COURT: Did he assist you or Mr. Baddouch --
> well, let me ask you about you since I'm asking
> about your personal knowledge. Did he assist you
> at anytime in applying for multiple credit cards?
>
> THE WITNESS: No, he did not.
>
> THE COURT: Did he assist you in applying for a
> car lease for a Toyota SUV?
>
> THE WITNESS: No, he did not.
>
> THE COURT: Did he assist you in applying for
> financing for your home?
>
> THE WITNESS: No.

(Tr. at 51-52 (emphasis added).)

The statements provided by Isaac Gindi and Mayer Gindi
while testifying are contradicted by the statements made by
Mayer Gindi and Yitzchok Kaplan during their proffer sessions.
Mayer Gindi told the government during his proffer session that
he knew his brother Isaac Gindi intended to use Mejia in the
fraudulent business loan, credit card, and the Toyota lease
schemes, and that his brother Isaac constantly called him to
discuss how to use the government agent in the fraudulent
scheme. Mayer Gindi also stated during his proffer session that
he, Isaac Gindi, and Daniel Baddouch met at the home of Isaac
Gindi's in-laws to discuss what Baddouch had told government
agents and that he had told Isaac Gindi and Baddouch not to
withdraw the fraudulent financing applications and other
documents they had submitted using Mejia's identity.

The court does not find it plausible that Mayer Gindi
would have forgotten these facts or been ignorant of these facts
while he was testifying under oath. Thus, the court finds that
Mayer Gindi intentionally gave false testimony concerning a
material matter – his involvement in and knowledge of Isaac
Gindi's bank fraud conspiracy – while testifying before this
court.

In addition, the court does not find it plausible that Isaac Gindi would have forgotten about or been ignorant while testifying before this court of the extent of his brother Mayer Gindi's knowledge of and participation in the instant bank fraud conspiracy to which Isaac Gindi pleaded guilty. Accordingly, the court finds that Isaac Gindi intentionally gave false testimony concerning a material matter – his brother Mayer Gindi's involvement in and knowledge of the instant bank fraud conspiracy – while testifying before this court.

Third, although Mayer Gindi also stated during the course of his proffer session that he "did not get involved in any part of the [Isaac Gindi] application using Mejia's information," this statement is contradicted by the statements of Baddouch during his interview and the statements by Kaplan during his proffer session. (Baddouch Mem.; Kaplan Mem.) Because of these contradictions, and due to the court's concerns about Mayer Gindi's credibility and the fact that Mayer Gindi may have made this statement for self-serving reasons, the court is unable to determine the full extent of any role played by Mayer Gindi in Isaac Gindi's conspiracy because the details of Mayer Gindi's involvement are presumably known only to Mayer Gindi and Isaac Gindi. (Proffer Mem. ¶¶ 51, 61.)

The court notes that, in the instant motion for reconsideration, petitioner's counsel rely heavily on statements

during proffers by Mayer Gindi and Yitzchok Kaplan and the interview of Daniel Baddouch. Yet petitioner's counsel fail to address the fact that these statements also demonstrate that their client, Isaac Gindi falsely testified that his brother Mayer Gindi had *no* involvement and provided *no* assistance beyond the initial referral of Mejia. Moreover, counsel for petitioner have not submitted an explanatory affidavit or declaration of the defendant that would attempt to reconcile their client's sworn testimony and the contradictory statements of Mayer Gindi, Daniel Baddouch, and Yitzchok Kaplan.

## **Discussion**

### **A. Legal Standards**

As explained in the Feb. 5 Order, to establish an actual conflict of interest, a defendant must meet two requirements: First, he must establish that counsel actively represented conflicting interests such that the interests of the defendant and his attorney "diverge[d] with respect to a material fact or legal issue or to a course of action." *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002). Second, the defendant must show that the "actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980). To demonstrate an adverse effect on counsel's performance, a defendant must establish that the actual conflict resulted in a "lapse of

14

representation." *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir. 1996) (quotation and citation omitted).

"To prove a lapse of representation, a defendant must 'demonstrate that some plausible alternative defense strategy or tactic might have been pursued' but was not pursued *because* 'the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *United States v. Felzenberg*, Nos. 97 Civ. 2800 & 93 CR 460, 1998 WL 152569, at *15 (S.D.N.Y. Apr. 2, 1998) (emphasis added) (quoting *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993)); *see also United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000) ("the defendant must also show causation-that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.") (internal quotation and citation omitted).

Finally, "[t]he term 'plausible alternative defense strategy' does not embrace all possible courses of action open to a defense attorney; it refers to those which a zealous advocate would reasonably pursue under the circumstances." *Lopez v. Scully*, 58 F.3d 38, 42 (2d Cir. 1995).

## B. Application

The court notes at the outset that the government should have turned over the newly disclosed documents to petitioner's counsel before the February 3-4 evidentiary

hearing.  Although the assistant United States attorneys have represented to the court that they did not remember the proffer session memorandum because of the passage of time, they should have been aware of and turned over the documents in a timely fashion prior to the hearing.  Their failure to do so has led to additional motion practice and the expenditures of resources by the parties and the judiciary.  Nevertheless, the fact that the government failed to turn over these documents before the evidentiary hearing does not necessarily entitle petitioner to the relief he seeks.  Therefore, the court will address the new arguments raised by petitioner based on the additional evidence.

### 1. Whether Evidence is Exculpatory

The court will first consider petitioner's argument that "the newly discovered exculpatory evidence casts doubt on Isaac's own culpability" because he "arguably sought to withdraw from the conspiracy by withdrawing Mejia's loan applications" but did not do so because of Mayer Gindi's instructions to "let it ride."  (Mot. at 11.)  This claim is meritless because it distorts the facts and misapplies the law.

First, although Mayer Gindi stated in the proffer session that he discussed withdrawing the Mejia credit applications and related documents with Isaac Gindi and Baddouch and told them that they should not pull back the applications, he did so during a meeting that was held to discuss the

ramifications of what Baddouch had told government agents.
(Proffer Mem. ¶ 59.) There is no indication that *Isaac* Gindi
ever made any affirmative statements indicating his intent to
withdraw from a bank fraud conspiracy. (*Id.*)

Second, the crime of conspiracy to commit bank fraud
is completed once the parties enter into an unlawful agreement
because "[t]he essence of conspiracy is 'the combination of
minds in an unlawful purpose' . . . . Far from contradicting an
element of the offense, withdrawal presupposes that the
defendant committed the offense." *Smith v. United* States, 133
S. Ct. 714, 719 (2013) (quoting *United States v. Hirsch*, 100
U.S. 33, 34 (1879)). Accordingly, Isaac Gindi's participation
in a general discussion to discuss possibly withdrawing
applications after he engaged in the bank fraud conspiracy does
not exculpate him because, even if this evidence had been
disclosed, there would have been no "reasonable probability that
. . . the result of the proceeding would have been different" as
it would not have altered his liability for the underlying
conspiracy to commit bank fraud. *Strickler v. Greene*, 527 U.S.
263, 280 (1999) (internal quotation and citation omitted).

The court also notes that Isaac Gindi's mere
participation in a discussion about possibly withdrawing the
fraudulent applications took place only after he became aware of
the government's knowledge of his criminal activities, and is

17

thus insufficient to show that he actually withdrew or attempted to withdraw from the conspiracy because there is no indication that he took affirmative steps to do so or voiced any clear statements indicating his intent to do so. (Proffer Mem. ¶ 59.) Finally, even if Isaac Gindi could show he withdrew from the conspiracy, the withdrawal would only "terminate[] the defendant's liability for postwithdrawal acts of his co-conspirators, but he [would] remain[] guilty of conspiracy." *Smith*, 133 S. Ct. at 719.

### 2. Guilty Plea

Petitioner also argues that Mr. Kaye "could not advise Isaac to seriously consider exercising his right to trial since a trial would necessarily result in Kaye being disqualified from representing Isaac" as a result of his knowledge of Mayer Gindi's statements to the government. (Mot. at 8.) The court finds this argument implausible because petitioner affirmed during the February 3-4 evidentiary hearing and in his most recent motion papers that he does *not* wish to withdraw his guilty plea. (*Id.* at 1, 2 n.1, Tr. at 4.) By affirming his guilt on the record since replacing Mr. Kaye with new counsel and repeatedly stating that he does not seek to withdraw his guilty plea, petitioner has demonstrated that he pleaded guilty of his own volition and not as a result of any undue influence by Mr. Kaye resulting from any purported conflict.

In addition, Mr. Kaye did not begin representing Isaac
Gindi until *after* Mayer Gindi, who did *not* enter into a
cooperation agreement, pleaded guilty on May 27, 2011, to an
information that charged him one count of conspiracy to commit
wire fraud in connection with a mortgage fraud scheme, in
violation of 18 U.S.C. § 1349, and one count of bankruptcy
fraud, in violation of 18 U.S.C. § 152(3), in an unrelated case
involving a completely different fraudulent scheme before Judge
Sandra L. Townes of this court*, United States v. Mayer Gindi*,
No. 11-cr-347 (SLT). (No. 11-cr-347, Minute Entry for Guilty
Plea of Mayer Gindi, 5/27/11; No. 11-cr-294, Minute Entry dated
7/14/11 stating Isaac Gindi was retaining Mr. Kaye as new
counsel; Tr. at 99-100.) Consequently, despite petitioner's
arguments to the contrary, when Mr. Kaye began representing
Isaac Gindi, it was clear that Mayer Gindi would not be a
witness against Isaac Gindi in the event that Isaac Gindi
exercised his trial rights because Mayer Gindi had already
pleaded guilty and was not entering into a cooperation agreement
with the government. Nor is there any plausible prospect that
Mr. Kaye would testify against Isaac Gindi, notwithstanding
petitioner's contrary argument. Thus, Mr. Kaye had no reason to
encourage Isaac Gindi to plead guilty due to his representation
of Mayer Gindi.

### 3. Cooperation

Similarly, the court finds that there is no new evidence indicating that Mr. Kaye failed to advise petitioner to gain leniency by cooperating against Mayer Gindi as a result of any purported actual conflict related to Mr. Kaye's representation of Mayer Gindi. Based on testimony at the February 3-4 hearing, the court found that Mr. Kaye had credibly testified that Isaac Gindi had consistently refused to cooperate with the government against anyone and that Julie Gindi was also opposed to her husband cooperating against anyone. (Feb. 5 Order at 14, 32-33.) Instead, petitioner now argues that because Mr. Kaye could not tell him about the statements made by Mayer Gindi during Mayer Gindi's proffer session, Isaac Gindi "remained blissfully ignorant of the alacrity with which his brother Mayer, aided by Kaye, gave him up to the government." (Mot. at 11.)

The court disagrees with petitioner that the additional evidence demonstrates that petitioner declined to cooperate with the government as a result of Mr. Kaye's purported conflict. To the contrary, the additional evidence only buttresses Mr. Kaye's testimony that Isaac Gindi was unwilling to cooperate with the government despite his knowledge of the criminal activities of Mayer Gindi, Baddouch, and Kaplan. According to the notes of Mayer Gindi's proffer session, Isaac

Gindi had knowledge related to his brother's involvement in the bank fraud conspiracy at issue in this case. (Proffer Mem. ¶¶ 54, 59.) Yet, instead of describing the true extent of his brother Mayer Gindi's involvement, Isaac Gindi chose to falsely testify during the February 3-4 hearing that his brother Mayer Gindi had *no* role in the conspiracy besides the initial referral of Mejia, (Tr. at 51-52), and now argues that Mayer Gindi is more culpable than petitioner for the fraudulent scheme to which petitioner pleaded guilty, (Mot. at 7). Because Isaac Gindi offers no explanation for his contradictory position, it appears that he was willing to knowingly provide false testimony under oath rather than testify truthfully about his brother's involvement. As a result, the court finds that the additional evidence only supports Mr. Kaye's earlier testimony that Isaac Gindi was advised of the advantages of cooperation but chose not to cooperate with the government on his own volition and with the support of his wife, Julie Gindi. In any event, Isaac Gindi has still failed to identify any information that he is willing to provide to the government that has not already been disclosed to the government.

### 4. Mr. Kaye's Credibility

The court also declines to accept petitioner's assertion that Mr. Kaye knowingly made a false statement to this court when he testified that he did not see a conflict in his

representation of both Isaac and Mayer Gindi.  Although the new
evidence shows that Mayer Gindi knew of and spoke with Isaac
Gindi about Isaac Gindi's fraudulent schemes, Mayer Gindi's
statements during his proffer session must be viewed in light of
the fact that Mayer Gindi ultimately decided to plead guilty
*without* a cooperation agreement, and that Mr. Kaye only began
representing Isaac Gindi *after* Mayer Gindi pleaded guilty.
(Feb. 5 Order at 3-4, Tr. at 99-100.)  Therefore, at the time
Mr. Kaye began representing Isaac Gindi, he was aware that Mayer
Gindi would not be cooperating with the government, and Mr. Kaye
subsequently was informed by Isaac Gindi that he, too, was not
willing to cooperate with the government against anyone, let
alone his brother Mayer Gindi.  Thus, contrary to petitioner's
assertion, the court sees no reason to change its finding that
Mr. Kaye credibly testified during the February 3-4 proceedings
that he did not see a potential conflict with representing both
Isaac and Mayer Gindi, (Tr. at 101), because the record
demonstrates that neither brother was interested in cooperating
with the government.

Petitioner further argues that the newly disclosed
documents show that Mr. Kaye "was not a credible witness"
because he gave "false testimony about a material issue."  (ECF
No. 21, Reply, 4/25/14, at 5.)  Specifically, in responding to a
question about why he chose not to pursue the strategy of

blaming Mayer Gindi, Mr. Kaye testified that he did not want to argue that Mayer Gindi was more culpable than Isaac Gindi because "besides the introduction of Angel Mejia, Mayer had nothing to do with anything of Isaac's case," and Mr. Kaye confirmed that he did not believe it would be a viable defense strategy to blame Mayer Gindi for Isaac Gindi's bank fraud conspiracy. (Tr. at 114.) On cross-examination, when Mr. Kaye was asked if he understood the only role played by Mayer Gindi in Isaac Gindi's bank fraud conspiracy to be the introduction of Isaac Gindi and Mejia, Mr. Kaye responded "[t]hat's correct." (Tr. at 124.)[5] Petitioner argues that because the new documents show that Mayer Gindi admitted to "far greater involvement than simply introducing the undercover officer to Isaac [Gindi]," the documents show that Mr. Kaye gave false testimony. (Reply at 5.)

Petitioner's argument is flawed for two reasons. First, as the court has explained, the newly disclosed documents show that Mayer Gindi knew that Isaac Gindi would use Mejia in a bank fraud conspiracy, spoke to Isaac Gindi about Mejia, and met with Isaac Gindi and Baddouch to discuss the ramifications of what Baddouch had told government agents. *See* Background section C. But the extent of Mayer Gindi's involvement is still

---

[5] Mr. Kaye also testified that he accompanied Mayer Gindi to a proffer meeting with the U.S. Attorney's Office, but Mr. Kaye was not asked about and thus did not testify as to what Mayer Gindi said in the proffer meeting. (Tr. at 103.)

unclear.  Indeed, Mayer Gindi also stated during the proffer meeting that he "did not get involved in any part of the [Isaac Gindi] application using Mejia's information," even though he knew Isaac Gindi was engaged in fraud and that it was wrong. (Proffer Mem. ¶ 61.)  Therefore, the court declines to find that the newly produced discovery shows that Mayer Gindi had "far greater involvement" than previously discussed, (Reply at 5), although the court acknowledges that his involvement included more than his referral of Mejia to petitioner, as both Gindis previously testified under oath.

Also, petitioner fails to account for the full context of Mr. Kaye's testimony.  Mr. Kaye testified that he believed Mayer Gindi had no real connection to Isaac Gindi's bank fraud conspiracy besides introducing Isaac Gindi to Mejia in response to questions concerning why he chose not to blame Mayer Gindi as more culpable than Isaac Gindi for Isaac Gindi's bank fraud conspiracy.  (Tr. at 114, 115, 124.)  Mr. Kaye's testimony was thus based on his belief that Mayer Gindi had no role other than the introduction of Mejia to Isaac Gindi and that it would thus not be plausible to argue that Mayer Gindi was more culpable than Isaac Gindi for a fraudulent scheme that Mayer Gindi was not even charged with committing.

While the newly disclosed evidence shows that Mr. Kaye was present when Mayer Gindi proffered that he had some role in

the instant bank fraud conspiracy beyond the initial referral of Mejia, the court declines to make the finding that Mr. Kaye *knowingly* made a material misstatement of fact given the passage of time since the proffer session and the fact that both Isaac Gindi and Mayer Gindi had consistently maintained and falsely testified that Mayer Gindi had no role beyond the initial referral of Mejia. (Tr. at 35, 51-52.) Based on Mr. Kaye's demeanor while testifying and the fact that his testimony was consistent with public statements made by the Gindis under oath in the proceedings, the court finds that Mr. Kaye, unlike the Gindis, was mistaken in his testimony but did not knowingly make a material misstatement. The court also finds that the Gindis would have remembered the details of Mayer Gindi's involvement at the time of their testimony before this court because of their personal knowledge of and involvement in the bank fraud conspiracy, whereas Mr. Kaye would only have known what he was told by Isaac and Mayer Gindi.

Finally, *even if* Mr. Kaye had knowingly made a misstatement about the extent of Mayer Gindi's involvement, which the court finds that Mr. Kaye did *not* do, the court's credibility determinations would not change concerning Mr. Kaye's testimony about his interactions with Isaac Gindi, Mayer Gindi, and Julie Gindi because Mr. Kaye's testimony would not be rendered less credible than the testimony of Isaac Gindi, Mayer

Gindi, and Julie Gindi.  First, as explained, the court has found that Isaac Gindi and Mayer Gindi knowingly provided false testimony under oath about material issues.  In addition, the court found Mr. Kaye's account credible and the accounts of Mayer Gindi, Julie Gindi, and Isaac Gindi not credible based on, *inter alia*, (1) the demeanors of the witnesses while testifying, (2) the fact that Mr. Kaye's accounts of his interactions were more plausible and corroborated by other evidence, including the sentencing submissions he made on behalf of both Gindis, while the Gindis offered no documentary evidence or details supporting Isaac Gindi's assertions, including Isaac Gindi's motivation to engage in fraudulent schemes because of a debt of several hundred thousand dollars purportedly owed to Mayer Gindi, (3) the fact that Isaac Gindi, Julie Gindi, and Mayer Gindi are all felons who pleaded guilty to crimes involving fraud and false statements, and (4) that Isaac Gindi has twice confirmed that he does not wish to withdraw his guilty plea and has not stated that he has any information to offer to the government that has not already been disclosed to the government, actions which are consistent with Mr. Kaye's testimony that Isaac Gindi voluntarily pled guilty and was firmly opposed to cooperating with the government.  (Feb. 5 Order.)

### 5. Mayer Gindi's Culpability

Isaac Gindi has also failed to demonstrate that Mr. Kaye did not blame Mayer Gindi because Mr. Kaye feared exposing Mayer Gindi to additional liability. As an initial matter, the newly disclosed evidence does not show that Mr. Kaye could have plausibly argued that Mayer Gindi was somehow *more* culpable than Isaac Gindi for the bank fraud conspiracy in this case. As explained previously, the newly disclosed evidence shows that Mayer Gindi knew about Isaac Gindi's scheme, spoke to Isaac Gindi frequently about the scheme, and met with Isaac Gindi and Daniel Baddouch to discuss the ramifications of what Baddouch had told government agents and offer advice. (Proffer Mem. ¶ 59.) Although the recently disclosed information shows that Mayer Gindi knew about and had some involvement in Isaac Gindi's bank fraud conspiracy beyond the mere referral of Mejia, the court finds that an attorney could not plausibly argue that Mayer Gindi was somehow *more* culpable than Isaac Gindi for a bank fraud conspiracy that Mayer Gindi was not charged with committing, especially considering that Mayer Gindi *also* told the government during the proffer session that he "did not get involved in any part of [Isaac Gindi's] application using Mejia's information." (*Id.* ¶ 61.)

Even if Mayer Gindi *were* more culpable than Isaac Gindi for the bank fraud conspiracy at issue in this case, the

court finds that Mr. Kaye did not pursue blaming Mayer Gindi for strategic reasons rather than because of any purported conflict. Mr. Kaye credibly testified that he wanted to ensure that Isaac Gindi would receive his acceptance of responsibility points and appealed to the court at sentencing by highlighting petitioner's showing of remorse, family circumstances, acceptance of responsibility, and prior good acts. (Tr. at 114-115.) In addition, Isaac Gindi's contradictory testimony during the evidentiary hearing that his brother "did not assist" him in any respect concerning the bank fraud scheme beyond the initial referral of Mejia, (*id.* at 51-52), only further supports Mr. Kaye's testimony that he did not want to blame Mayer Gindi for strategic reasons because it would not have been plausible for Isaac Gindi to claim, on the one hand, that his brother did not assist him beyond the initial referral of Mejia and, on the other hand, to argue that Mayer Gindi was also more culpable. (Feb. 5 Order at 26.)[6]

---

[6] Similarly, petitioner also fails to show that Mr. Kaye's representation of him was ineffective under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). As explained, the court finds that Mr. Kaye represented Isaac Gindi after Mayer Gindi pleaded guilty without a cooperation agreement, and that Isaac Gindi, Mayer Gindi, and Julie Gindi were all opposed to cooperating with the government. Furthermore, the court continues to find that Mr. Kaye credibly testified that he presented certain arguments and not others at sentencing due to strategic considerations, and not because of any purported conflict in his representation of Mayer Gindi and Isaac Gindi. Given the court's credibility findings, it declines to reopen the evidentiary hearing.

## 6. Challenge of Loss Calculations

Petitioner also argues that the "new and additional evidence of [petitioner's] stated intention to repay any loan proceeds reveals another lapse" in Mr. Kaye's representation. (Mot. at 12.) This argument lacks merit because the additional evidence does not change this court's findings. First, as explained by the court in detail in its previous order, Mr. Kaye *did* argue in his sentencing submission *and* during the sentencing that Isaac Gindi intended to repay the money he sought through the fraud conspiracy. (Feb. 5 Order at 27-28.) Furthermore, this court rejected Mr. Kaye's argument, finding that it was not plausible that Isaac Gindi intended to repay the hundreds of thousands of dollars he tried to borrow through fraudulent means because he lacked the means or assets to do so. (*Id.*) The additional scattered references to an intent to repay money in the new discovery produced by the government are contradicted by other statements regarding Isaac Gindi's apparently dire financial condition and thus do not alter this court's prior analysis of petitioner's intended loss and lack of intent to repay. For example, Mayer Gindi proffered that he knew Isaac Gindi intended to form a company in the undercover agent's name, obtain a fraudulent business loan, and not pay it back. (Proffer Mem. ¶ 55.) Similarly, Yitzchok Kaplan proffered that Isaac Gindi and Mayer Gindi were "desperate" for money and that

Isaac Gindi had a company that was struggling financially.
(Kaplan Mem. ¶¶ 9, 26.)

Petitioner also argues that this court made a
"baseless and clearly erroneous" factual determination when it
found that Mr. Kaye was not aware of Baddouch's statement that
Isaac Gindi and Mayer Gindi purportedly would be receiving and
making payments on the loan and credit they obtained.  (Mot. at
12.)  Petitioner has misinterpreted this court's Feb. 5 Order
and misstated the record.  As the court's Feb. 5 Order
explained, although Mr. Kaye testified that his practice would
have been to read sentencing submissions made on behalf of Mr.
Baddouch, Mr. Kaye testified that he was not aware of the
Baddouch statement concerning payments until reading a
submission by petitioner's new counsel before the February 3-4
evidentiary hearing:

> Q Did you speak to your client, Mayer, about the
> fact that he had been implicated in the scheme?
>
> A I never spoke to him about it.
>
> Q But you were aware of it, correct?
>
> A I was aware of that by your submission.
>
> Q You mean the first time you became aware of the
> fact that Mayer was going to be receiving
> payments was when you read it in our submission?
>
> A That's correct.

Q But now having read it in our submission, you are aware that his role was more, is greater than just making an introduction, correct?

A *From reading your submission.*

(Tr. at 125 (emphasis added).)

When considered in context, Mr. Kaye's testimony shows that while his general practice was to read sentencing submissions made on behalf of Baddouch, Mr. Kaye only became aware of Baddouch's statement that Mayer Gindi may have received payments from Isaac Gindi's fraudulent scheme in connection with the papers submitted by Isaac Gindi's new counsel before the evidentiary hearing. Additionally, as the government has pointed out, Mr. Kaye was not aware of the Baddouch or Kaplan reports because he did not receive them during discovery. Thus, petitioner has failed to show that Mr. Kaye did not make this argument as a result of any purported conflict because the court finds that Mr. Kaye was simply not aware of these additional statements. (ECF No. 20, Memorandum in Opposition, 4/9/14, at 15.)

Finally, *even if* Mr. Kaye had been aware of these statements, as the court explained in its Feb. 5 Order, the "use or failure to use the [Baddouch] statement is not an alternative defense [that] was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests as it does not help or hurt one Gindi brother more than the other or at the

31

expense of the other." (Feb. 5 Order at 29 (internal quotations omitted) (alteration in original).)[7]

**7. Other Arguments**

Finally, the court notes that petitioner's counsel has also misrepresented certain statements made by the government during the February 3-4 evidentiary hearing by quoting them completely out of context. Near the conclusion of the hearing, the government stated that while it would be easier for all parties and the court to "just do a resentencing," it would be "extremely disturbing to have people come up here and lie on the witness stand in order to get them the most easy out . . . . [I]f you could come up on the witness stand and say whatever you needed to say, and at the end of the day we can put that all aside and say let's just do a resentencing, that's not, certainly, the best way to practice." (Tr. at 221-222.) In other words, the government argued that Isaac Gindi should not be permitted to testify falsely about material issues under oath, present testimony from his wife that this court found to be not credible and present false testimony about material issues from his brother that flatly contradicts his argument that his brother was more culpable, and receive another sentencing through such conduct.

---

[7] In addition, the court still finds credible Mr. Kaye's testimony that he did not focus his submissions and defense strategy on challenging the loss calculations because he made the strategic decision that petitioner should take responsibility for his actions. (Feb. 5 Order at 29-30.)

The court is aware that the government should have turned over the relevant notes that led to this motion for reconsideration to petitioner's counsel before his evidentiary hearing. While the court agrees that it would have been easier for the court and all parties to grant a resentencing rather than conduct an evidentiary hearing and decide two post-sentencing § 2255 motions, the court cannot allow a defendant who flagrantly provides false statements about material issues to the court to receive a resentencing merely for the sake of expedience.

## Conclusion

For the reasons set forth above, the court denies petitioner's motion for this court to reconsider its decision denying his motion to vacate his judgment of conviction and be resentenced pursuant to 28 U.S.C. § 2255. A certificate of appealability will not issue pursuant to 28 U.S.C. § 2253(c)(2) because the court finds that petitioner has failed to make a substantial showing of the denial of a constitutional right.

**SO ORDERED.**


Dated: May 21, 2014
      Brooklyn, New York

                                     _____ /s/_____
                                       KIYO A. MATSUMOTO
                                       United States District Judge
                                       Eastern District of New York